UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YOURK

---------------------------------------------------------------------x

MUSTAFA ABUELHIJA,

                            **Plaintiff,**

                         -against-

DAVID CHAPPELLE, and PILOT BOY
PRODUCTIONS, INC.

                        **Defendants.**

---------------------------------------------------------------------x

:    **08 CV 3679 (HB)**

:    <u>**OPINION & ORDER**</u>

**Hon. HAROLD BAER, JR., District Judge:**

Plaintiff Mustafa Abuelhija ("Abuelhija") brings this breach of contract action against David Chappelle ("Chappelle"), the well known comedian and entertainer, and Chappelle's production company Pilot Boy Productions ("Pilot Boy" and, collectively with Chappelle, "Defendants").  Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56.  For the reasons that follow, Defendants' motion is GRANTED.

## I. BACKGROUND

Chappelle is a well-known comedian and actor who has starred in his own television show, *Chappelle's Show*, which aired on Comedy Central, as well as in feature films.  Defts. 56.1 Stmt. ¶1.  Pilot Boy is a Delaware corporation that produces television shows and other entertainment ventures featuring Chappelle.  *Id*. at ¶2.  Plaintiff Abuelhija was once retained by Chappelle as a manager, and the breakdown of that relationship in 2005 ultimately led to this litigation.  *Id*. at ¶3.

The path to the present dispute is marked by an earlier detour through this Courthouse. In December 2005, Abuelhija filed suit in this Court alleging that the Defendants owed him monies promised as payment for his services as a manager and as a producer of the movie *Dave Chappelle's Block Party* (hereinafter, "*Block Party*").  *See  Abuelhija v. Chappelle*, No. 05 Civ. 10393 (JGK).  Of some relevance here, Abuelhija alleged in his initial complaint that in April 2005, "Chappelle essentially walked away from his contractual obligation [with Comedy Central] having completed only approximately half of the third season episodes of *Chappelle's Show*."  *See* No. 05 Civ. 10393; (JGK) First Am. Compl. ¶45.

In late 2005 and early 2006, Chappelle and Abuelhija negotiated a settlement of the initial action, which was first reduced to writing in a one-page "term sheet" and ultimately memorialized in a fully integrated settlement agreement dated February 26, 2006 (the "Settlement Agreement").   This case concerns the Defendants' alleged breach of the Settlement Agreement, and thus its terms are critical.   Under the Settlement Agreement, the Defendants agreed to pay Abuelhija a lump sum within thirty days, as well as specified percentages of revenues and compensation earned from three entertainment ventures.   Specifically, the Settlement Agreement provides that

> Pilot Boy shall pay to Abuelhija [a specified percentage] of its future compensation, if any, for Seasons Two, Three and Four of Chappelle's Show under (i) the agreement dated as of July 12, 2004 between Central Productions LLC and Pilot Boy Productions, Inc. f/s/o Dave Chappelle and any renegotiations or restructuring thereof.

Decl. of Ivy Davy, dated December 18, 2008 ("Davy Decl."), at Ex A ("Settlement Agreement"). The payments required to be made pursuant to this provision of the Settlement Agreement are limited to amounts received after December 20, 2005 and are hereinafter referred to as the "*Chappelle's Show* Payments."[1]

The Settlement Agreement further provides that Pilot Boy will pay Abuelhija a specified percentage of "any amounts actually received after December 20, 2005 under the agreement dated as of October 21, 2004 between Columbia TriStar Home Entertainment and Dave's Comedy Special, Inc. regarding *For What It's Worth*" (hereinafter, the "Columbia TriStar Payments").   *Id.* Finally, the Settlement Agreement provides that Pilot Boy will pay Abuelhija a specified percentage of "any amounts actually received after December 20, 2005, in excess of [its] investment in the Block Party movie" (hereinafter, the "*Block Party* Payments").   *Id.*  The Settlement Agreement required the Defendants to instruct certain payors of funds related to *Chappelle's Show* and *Block Party* to notify Abuelhija, through a letter to his counsel, each time a payment was made to Pilot Boy.   *Id.*  The Defendants have provided such notices to the relevant payors, and Abuelhija does not object to the Defendants' compliance with the Settlement Agreement in this regard.   *See* Defts.' 56.1 Stmt. ¶14; Pl's. Reply Stmt. ¶14.   Apart

---

[1] In contrast to the final Settlement Agreement, the term sheet provides that Abuelhija is entitled to ten percent of future compensation from Seasons 2, 3, and 4 of *Chappelle's Show* irrespective of the contract pursuant to which such payments are made.  See Affirmation of Scott J. Kreppein, dated May 15, 2009 ("Kreppein Aff.") at Ex. C.

from the lump sum payment made shortly after the Settlement Agreement was signed, the Defendants have not made any payments to Abuelhija pursuant to the Settlement Agreement.

The Defendants argue principally that because they have received no revenues covered by the Settlement Agreement, they have neither incurred nor breached any obligation to make payment to Abuelhija. With respect to the *Block Party* Payments, Abuelhija concedes that the Defendants have not received funds in excess of their initial investment in the *Block Party* movie, but he now argues that Chappelle should be ordered to "take steps" to collect the amounts the Defendants are owed from one of the film's producers. Pl.'s 56.1 Reply Stmt. at ¶ 33; Pl.'s Mem. in Opp'n. at 12. The Defendants also contend, and Abuelhija admits, that they have received no payments relating to the Showtime television special *For What It's Worth*. Defts.' 56.1 Stmt. at ¶35; Pls. Reply Stmt. at ¶35.

The facts pertaining to the *Chappelle's Show* Payments are not as straightforward. They implicate Chappelle's two contracts with Comedy Central that governed the development and production of *Chappelle's Show*, Chappelle's departure from the show in the middle of the production of Season 3, and the ensuing circumstances in which the show was left, in Chappelle's words, "in a state of limbo." Tr. of Chappelle Dep. at 102:17. The Defendants' written agreements with Comedy Central are dated March 6, 2002 (the "2002 Agreement") and July 12, 2004 (the "2004 Agreement").[2] The 2002 Agreement governed production of the pilot for *Chappelle's Show* and, upon Comedy Central's option, the production of Seasons One and Two of the program. Davy Decl., at Ex A. In addition to providing for per-episode payments, the 2002 Agreement affords to Pilot Boy rights to a percentage of the profits from *Chappelle's Show*. As an "advance" against Pilot Boy's profit participation, Comedy Central agreed to pay Pilot Boy one specified percentage of the total Adjusted Gross Receipts ("AGR") for merchandising of the show and another, lower percentage of the AGR for all other means of exploitation of the show (such percentages, the "2002 AGR Percentages"). Abuelhija acknowledges that he did not have a role in negotiating the 2002 Agreement. Pls.' 56.1 Reply Stmt. at ¶18.

Following the considerable success of the first two seasons of *Chappelle's Show*, Pilot Boy entered into the 2004 Agreement, which was to govern the production of Seasons 3 and 4 of the program. Defts. 56.1 Stmt. at ¶21. Commensurate with the success of the first two seasons,

---

[2] More precisely, the Defendants' contracted with Central Productions LLC, an entity affiliated with Comedy Central.

the 2004 Agreement considerably increased both the per-episode compensation and profit participation percentages to which the Defendants were entitled.  Section 3.1 of the 2004 Agreement provides that so long as Chappelle "fully performs all of [his] material obligations" under the agreement, Comedy Central will pay Pilot Boy a specified, and substantially higher, percentage of AGR received by Comedy Central "from exploitation of ancillary uses . . . of the Series and all elements thereof retroactive to the 2003 and 2004 seasons of the series."[3] Abuelhija contends that he played a significant role in negotiation of the 2004 Agreement. Defts. 56.1 Stmt. at ¶22.

Chappelle allows that after he left the set, the status of *Chappelle's Show* was "uncertain" Tr. of Chappelle Dep. at 102:18.  Although Comedy Central has asserted that Chappelle breached the 2004 Agreement, the current status of Chappelle's relationship with Comedy Central is unclear.  *See* Decl. of Richard Mattiaccio, dated April 15, 2009, ("Mattiaccio Decl."), Ex. 2.  Abuelhija alleges that Chappelle has received two payments from Comedy Central that constitute revenues derived from exploitation of Seasons One and Two of *Chappelle's Show*, and that the Settlement Agreement entitles him to a percentage of each payment to the extent it is derived from exploitation of Season Two.  The first payment covers the period ending December 31, 2006 and, according to the "Participation Statement" which accompanied it, the sum was calculated by applying percentages to "Net Receipts" and AGR that precisely matched the 2002 AGR Percentages.  Kreppein Aff., Ex. F.  The second payment at issue covers the period ending June 30, 2007 and was accompanied by a similar "Participation Statement" that also used the 2002 AGR Percentages to calculate the amounts owed to Pilot Boy.  In a letter dated December 8, 2008, Comedy Central Senior Vice President and General Counsel Joella West wrote the following to Chappelle's attorney:  "Because Mr. Chappelle breached his obligations under the parties' 2004 Agreement, Comedy Partners has accounted to Mr. Chappelle for Seasons 1 and 2 under the parties' 2002 Agreement."  Mattiaccio Decl., Ex. 2.

---

[3] Exhibit "I" to the 2004 Agreement defines "Ancillary Uses" broadly as "all distribution and/or exploitation of the Project, if any, in any manner or media now known or hereafter devised, throughout the universe, in perpetuity."  The "2003 and 2004 seasons of the series" refers to Seasons One and Two of *Chappelle's Show*.

## II. LEGAL STANDARD AND APPLICABLE LAW

### A. Summary Judgment Standard

A court may grant summary judgment "only if it can be established that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 367-68 (2d Cir. 2003). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247-48 (1986). A dispute concerning a material fact is genuine if the "'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson,* 477 U.S. at 248).

"In determining whether the moving party is entitled to judgment as a matter of law, the court must resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). However, "[i]n order to defeat a properly supported summary judgment motion, the opposing party must proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is material under the applicable legal principles." *Id*. (quoting Fed. R. Civ. P. 56(e)).

### B. Applicable Law

The Settlement Agreement provides that it is to be governed by the laws of the State of New York.  Consequently, New York law governs this diversity action. *See Crane Co. v. Coltec Industries, Inc.*, 171 F.3d 733, 737 (2d Cir. 1999) (applying New York law where agreement so specified).

## III. DISCUSSION

### A.  Columbia TriStar Payments and *Block Party* Payments

With respect to Abuelhija's claim that under the Settlement Agreement he is entitled to percentages of the Columbia TriStar Payments and *Block Party* Payments, Defendants' motion for summary judgment is easily resolved.  First, there is no dispute as to the meaning of the provisions of the Settlement Agreement that entitle Abuelhija to a percentage of amounts "actually received" from Columbia TriStar for the Showtime comedy special *For What It's Worth* or from any third party as proceeds from the movie *Block Party* in excess of Defendants'

5

initial investment.  Second, there is no dispute that Defendants have *not* "actually received" Columbia TriStar Payments or *Block Party* Payments.  *See* Pls. 56.1 Stmt. ¶¶ 33-37.

### 1. Columbia TriStar Payments

Defendants' accountant declares that Defendants have received no monies from Columbia TriStar related to *For What It's Worth* and Abuelhija testified in his deposition that he has no knowledge or evidence of any such payments.  Abuelhija Depo. at 67:7-11.  Indeed, Abuelhija does not oppose Defendants' motion for summary judgment with respect to his claims to a percentage of the Columbia TriStar Payments.  Without any specific facts to which he can point to show the existence of a genuine issue for trial, Abuelhija's election not to oppose this aspect of the Defendants' motion is well founded.  *See Major League Baseball Properties*, 542 F.3d 310.  Consequently, Defendants' motion for summary judgment with regard to Abuelhija's claims to a percentage of the Columbia TriStar Payments is GRANTED.

### 2. *Block Party* Payments

Having acknowledged that the Defendants have received no payments in excess of their initial investment in *Block Party*, Pls. 56.1 Stmt. ¶33,  Abuelhija's argument in opposition to the Defendants' motion  on these claims is something of a "hail-Mary."  Abuelhija contends that because Chappelle admitted in his deposition that he is owed a substantial sum related to *Block Party* by one of the movie's producers, the implied covenant of good faith and fair dealing obligates the Defendants to make reasonable efforts to collect.  Under New York law the implied covenant "encompasses the obligation that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Ferguson v. Lion Holding, Inc.*, 478 F.Supp.2d 455, 469 (S.D.N.Y. 2007) (quoting *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384 (1995)).   Chappelle testified at his deposition that the producer made an informal and unsolicited acknowledgment of the debt, and that Chappelle is comfortable relying on this acknowledgment based on the producer's previous successes and interest in maintaining his own reputation.  Chappelle Dep. at 140-142.  Furthermore, the Defendants complied with their obligation under the Settlement Agreement by instructing the producer in writing to notify Abuelhija's counsel if and when the producer made payment to Pilot Boy of funds related to *Block Party*.  Kreppein Aff. at Ex. H.  Because the Settlement Agreement entitles Abuelhija to a percentage of the *Block Party* Payments when they are "actually received" and not pursuant to any set time line, Chappelle's choice to rely on an informal promise of repayment instead of initiating legal action to collect the debt has neither

"destroyed" nor materially "injured" Abuelhija's rights under the Settlement Agreement.  While it is true that "[t]he state of a man's mind is as much a fact as the state of his digestion,"[4] all we have here is a picture of lethargy in the debt-collection world which fails to violate the implied covenant of good faith and fair dealing.  *See Dalton* 87 N.Y.2d at 389-390.

But even if Chappelle's failure to ascertain the amount he is owed or more earnestly pursue collection of the debt did violate the implied covenant, Abuelhija's request for "equitable relief" on the last page of his opposition brief is too vague and comes too late in the day to be granted.  *See, e.g.*, *Petrello v. White*, 533 F.3d 110, 115 (2d Cir. 2008) ("[A]n order for specific performance that lacks specificity is not a proper injunction.")  For the foregoing reasons, Defendant's motion for summary judgment with regard to Abuelhija's claims to a percentage of the *Block Party* Payments is GRANTED.

### B.  *Chappelle's Show* Payments

As with any case that requires interpretation of a contract, the threshold question is whether the Settlement Agreement is ambiguous; extrinsic evidence of the parties' actual intent may only be considered if the contract is found to be ambiguous as a matter of law. *South Road Associates, LLC v. Intern. Business Machines Corp*., 4 N.Y.3d 272, 278 (2005).  "Ambiguity is determined by looking within the four corners of the document, not to outside sources."  *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998).  A contract is not ambiguous "'merely because the parties urge different interpretations in the litigation.'" *TLC Beatrice Intern. Holdings, Inc. v. CIGNA Ins. Co.*, 97 Civ. 8589(MBM), 2000 WL 282967, *3 (S.D.N.Y. Mar. 16, 2000) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989).

The Settlement Agreement is unambiguous.  The Settlement Agreement makes clear that Abuelhija is only entitled to a percentage of "future compensation, if any, for Seasons Two, Three and Four of *Chappelle's Show*" to the extent payments are made after December 20, 2005, and "under the agreement dated as of July 12, 2004, between Central Productions LLC and Pilot Boy Productions, Inc. f/s/o Dave Chappelle and any renegotiation or restructuring thereof." There can be no mistaking that this provision refers to the 2004 Agreement which is expressly referenced by its date.  Although this leaves the question of whether the payments from Comedy Central were made pursuant to the 2004 Agreement or "a renegotiation or restructuring thereof," this factual question does not render the Settlement Agreement itself ambiguous as a matter of

---

[4] *Edgington v. Fitzmaurice*, 29 Ch. D. 459, 483 (1885) (Bowen, L.J.).

law.  Consequently, extrinsic evidence of the parties' intent—including the term sheet that preceded the Settlement Agreement—is inadmissible. *South Road Associates*, 4 N.Y.3d at 278.

It next must be determined whether the *Chappelle's Show* Payments were made under the 2004 Agreement or a "renegotiation or restructuring thereof."  Abuelhija does not dispute that the payments were calculated pursuant to the 2002 AGR Percentages and *not* the higher 2004 profit participation rates.  Rather, he argues that the 2004 Agreement superseded and extinguished the 2002 Agreement and that as a consequence the payments at the lower rates must have resulted from a "renegotiation or restructuring" of the 2004 Agreement.   There are several problems with this argument.

First, Abuelhija fails to establish that the 2004 Agreement superseded and replaced the 2002 Agreement, i.e. that it was a *novation* of the earlier agreement.  "'New York courts have set a stringent standard for novation.'" *Citibank, N.A. v. Benedict*, No. 97 Civ. 9541 (AGS), 2000 WL 322785, *8 (S.D.N.Y. Mar. 28, 2000) (quoting *Wang v. Chen,* No. 89 Civ. 8319 (JSM), 1992 WL 7840, *6 (S.D.N.Y. Jan. 10, 1992)).  For a novation to be effective, both parties must have "clearly expressed their intention that a subsequent agreement superseded or substituted for an old agreement." *Id.* (quoting *Flaum v. Birnbaum,* 120 A.D.2d 183 (4th Dep't. 1986).  Here, the 2004 Agreement contains no clear expression of an intent to extinguish the 2002 Agreement and substitute the obligations created in the earlier contract with those of the later contract.  Indeed, the only mention of the 2002 Agreement in the 2004 Agreement suggests that the earlier agreement remains in force.[5]

The two provisions on which Abuelhija relies in support of his argument for novation also fail to clearly express the requisite intent to replace substitute the later agreement for the earlier one.  Abuelhija points first to the merger clause of the 2004 Agreement.   Located towards the end of the contract in the section of "Miscellaneous" provisions, it provides as follows: "This Agreement contains the entire understanding between the parties, and supersedes all understandings of the parties hereto relating to the subject matter herein, and cannot be changed or terminated orally."  An intent to extinguish earlier contractual obligations cannot be inferred from a standard merger clause simply because the parties to the later agreement also entered an earlier contract on a related topic.  The merger clause does not evidence a "clear expression" of intent to extinguish a separate and distinct written contract. *See Citibank,* 2000 WL 322785 at *8.

---

[5] Section 3.4 of the 2004 Agreement provides that "notwithstanding anything to the contrary in this Paragraph III.3 or in the agreement between [Pilot Boy] and [Comedy Central] dated as of March 6, 2002 . . . [the Defendants] reserve . .  the following rights . . . ."

Abuelhija also relies on the profit participation provision of the 2004 Agreement is support of his argument for novation.  It provides that if Chappelle "fully performs" all of his "material obligations" Pilot Boy will be entitled to a set percentage of AGR "from exploitation of 'Ancillary Uses' . . . of the *Series and all elements thereof retroactive to the 2003 and 2004 seasons of the series.*" (emphasis added).  Although the provision neither refers to nor expressly extinguishes the participation rights conferred by the 2002 Agreement, its reference to the "Series and *all* elements thereof" arguably suggests that the 2004 Agreement restates the terms of Pilot Boy's profit participation rights for the entirety of the *Chappelle's Show* enterprise, and that this restatement applies "retroactive[ly] to the 2003 and 2004 seasons of the series."  But even if this provision creates some doubts about whether the profit participation rights under the 2002 Agreement survive the adoption of the 2004 Agreement, a mere reference to "retroactive" participation rights is clearly insufficient to extinguish *all* of the obligations created under the 2002 Agreement which concerns much more than profit participation.  *See, e.g.,* 2002 Agreement at ¶11.1 (artistic and dramatic works created pursuant to the agreement are "works made-for-hire" for purposes of the Copyright Act).  What is more, the 2004 profit participation rights are expressly contingent upon Chappelle's full performance under that agreement, and both parties acknowledge that Chappelle left the set of the show midway through production of the first of two seasons that were to be produced pursuant to the 2004 Agreement.  *See* Pls. 56.1 Counter Stmt. at ¶1.  Accordingly, Abuelhija fails to establish that the 2004 Agreement completely supersedes and extinguishes the 2002 Agreement.

Abuelhija's contention that the payments calculated pursuant to the 2002 AGR Percentages must have been made pursuant to a "renegotiation or restructuring" of the 2004 Agreement is problematic for another reason as well.  Because the Defendants never agreed with Comedy Central that profit participation rates would revert to the 2002 AGR Percentages after Chappelle left the show in 2005, Abuelhija posits that Comedy Central *unilaterally* renegotiated or restructured the 2004 Agreement.  *See* Pls. Mem. in Opp'n. at 4.  However these contractual terms must be interpreted in accordance with their plain meaning, *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 88 (2d Cir. 2009), and both "renegotiation" and "restructuring" necessarily entail *bi*lateral agreement.  To "negotiate" means "to confer *with another* so as to arrive at the settlement of some matter." Mirriam-Webster's Collegiate Dictionary, 10th Ed. (emphasis added).  Like the tango, negotiation takes two.  Similarly, in the context of a written and fully integrated contract, the viability of any "unilateral restructuring" is

9

doubtful.  *See*, *e.g.*,  *Harris Trust and Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138, 1145 (2d Cir. 1992) ("Obviously, Hancock has no power unilaterally to alter or amend a contract to which it is a party[.]")  At his deposition, Abuelhija acknowledged that the terms encompass the concept of mutual agreement.[6]  Accordingly, even if Abuelija could establish that the 2004 Agreement was the only valid agreement between Comedy Central and the Defendants at the time the payments were made, it is a strained and awkward reading of the Settlement Agreement that construes the terms "renegotiation" and "restructuring" to encompass the unilateral acts of one party.

The final, and ultimately fatal, blow to Abuelhija's argument with regard to the *Chappelle's Show* Payments is delivered by the competent evidence the Defendants marshal to show Comedy Central understood the payments to be made under the 2002 Agreement, evidence which Abuelhija does not rebut.  First, the participation statements themselves make plain that the disputed payments were calculated in accordance with the precise percentages established by the 2002 Agreement.  Second, Comedy Central's general counsel expressly stated that "[b]ecause Mr. Chappelle breached his obligations under the parties' 2004 Agreement, Comedy Partners has accounted to Mr. Chappelle for Seasons 1 and 2 under the parties' 2002 Agreement."  Abuelhija does not offer evidence to explain why, if the 2004 Agreement was the only operative contract between the Defendants and Comedy Central, Comedy Central paid the Defendants anything after what they contend was the Defendants' breach of that agreement.  In fact, Abuelhija offers no evidence, only legal argument, to counter the Defendants' evidence which shows that Comedy Central believed it was making payment to the Defendants under the 2002 Agreement and *not* the 2004 Agreement or any "renegotiations or restructuring thereof." Abuelhija's exclusive reliance on the proposition that the profit participation rights conferred by the 2004 Agreement were in lieu of and not in addition to the 2002 participation rights is insufficient to defeat the Defendants' motion. "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." *Major League Baseball Properties*, 542 F.3d at

---

[6] Q:     Do you have any sense of what is involved in the restructuring of an agreement?
 A:     Well, renegotiation or restructuring, to me, they both intertwine with each other.
 Q:     So it's the same sort of thing involving communication between both sides –
 A:     Correct.
 Q:     – and reaching a different agreement?
 A:     Correct.
 Tr. of Abuelhija Dep. at 62-63.

310 (internal citation omitted). Here, because the fully integrated Settlement Agreement is unambiguous and extrinsic evidence of the parties' negotiations therefore inadmissible, Abuelhija proffers no evidence upon which a jury could rest a verdict in his favor. As a consequence, Defendants' motion for summary judgment with respect to Abuelhija's claims to entitlement to a percentage of the *Chappelle's Show* Payments must be GRANTED.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of the Court is directed to enter a judgment in accordance with this Opinion, to close this case and any open motions, and to remove this case from my docket.

SO ORDERED
June ____ 2009
New York, New York

U.S.D.J.

11